# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM G. THOMPSON, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 17-1042 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | |
| THOMAS MCGINLEY, *Superintendent of* | ) | |
| *SCI Coal Township*, the ATTORNEY | ) | |
| GENERAL OF THE COMMONWEALTH | ) | |
| OF PENNSYLVANIA, and the DISTRICT | ) | |
| ATTORNEY OF ALLEGHENY COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

## <u>OPINION AND ORDER</u>

William G. Thompson ("Petitioner") is a state prisoner, proceeding pro se, who has filed an

Amended Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. §

2254 (the "Amended Petition").   ECF Nos. 15 and 17.[1]   By means of the Amended Petition, he

seeks to challenge his three first degree murder convictions and the resulting three life sentences

made to run consecutive.

For the reasons that follow, the Amended Petition will be denied because it is time barred and

none of the grounds for relief merits the grant of federal habeas relief.  Furthermore, because jurists

---

[1] By text Order entered December 5, 2017, this Court deemed that Petitioner's filings at ECF Nos. 15
and 17 would together constitute the operative Amended Petition and ordered the Respondents to
address both filings as the Amended Petition.  ECF No. 18.

of reason would not find this disposition of the Amended Petition debatable, a certificate of appealability will also be denied.

## I. FACTUAL BACKGROUND

The Pennsylvania Superior Court in a Memorandum, filed February 12, 2012, addressing Petitioner's direct appeal of his convictions, ECF No. 23-2 at 120 – 124, adopted the trial court's recitation of the factual history recounted in the  Opinion of the Court of Common Pleas of Allegheny County filed on January 15, 2001.  ECF No. 23-1 at 101 – 186.  Specifically, the Superior Court noted that "[t]he trial court has set forth an exhaustive recitation of the relevant facts and procedural history underlying these appeals in its Opinion. *See* Trial Court Opinion, 1/15/10, at 2 – 4 (procedural history), 8 – 28 (factual history).  In the interest of brevity, we adopt the trial court's recitation herein by reference." ECF No. 23-2 at 121.  The trial court recounted the facts of this case as follows:

> On January 25, 2002, Terri Coles met her two children, ███████, age 8 and age 13, at Mr. Tommy's Restaurant, which was located in the Homewood Section of the City of Pittsburgh. She had gone there to meet her children's father, Parrish Freeman, Sr., (hereinafter referred to as "Freeman"), so that they could have dinner and then go to a movie. They had decided that they would treat their children to dinner out and a movie to celebrate the fact that ███████ had just received a straight A report card. They arrived at approximately 6:30 p.m. and after talking with Freeman, they ordered their meals.
>
> Freeman was at a table talking to Thomas Washington, Sr., (hereinafter referred to as "Washington"), the owner of Mr. Tommy's Restaurant. Also at the table were Brian Freeman, Brian Shealey, Catrell Boyd, (hereinafter referred to as "Boyd") and Thomas Mitchell, (hereinafter referred to as "Mitchell"). Mitchell was unemployed and living on social security disability benefits as a result of the fact that he was a paraplegic, having been shot in the back a number of years earlier. Mitchell was waiting in Mr. Tommy's Restaurant for his new Cadillac Escalade to be washed at the car wash which was part of Washington's businesses and separated from the restaurant by a parking lot which served both businesses. In addition, he was waiting

2

for Boyd to deliver keys to his Lincoln Continental which he had allowed Boyd to use earlier but now needed to give to his mother so that she might use that vehicle. Mitchell supplemented his social security disability income by monies he received from being a drug dealer in the Homewood area.

At approximately 6:45 p.m., Shealey arrived and went to the table where Freeman was sitting. His purpose in coming to the restaurant was two-fold: first he wanted to sell some pills to Freeman and, second, he wanted to discuss the upgrading of Mr. Tommy's menu with Washington since he was a part-time cook. In light of the fact that Freeman's family was with him and that Freeman had indicated that he did not want to discuss a drug transaction, Shealey confined his discussions to Washington's menu upgrade. Before walking into the restaurant, Shealey noticed several men lurking near the cut in the fence that abutted the parking lot. He noticed that one of these individuals was much taller than the others and that his eyes were unusually large. He also noted that all of these individuals were dressed in black.

In January of 1995, Boyd plead guilty to the charge of possession with intent to deliver a controlled substance and was sentenced to six and one-half to thirteen years. He was paroled in June of 2001. As a part of his restrictions on parole, he was not permitted to be involved with drugs, to consume alcohol or to possess a cellular phone. Despite these restrictions, Boyd had a cellular phone and, in fact, received a phone call shortly before Shealey entered the restaurant. Boyd wanted to keep his phone conversation private and moved from the table to a booth that was adjacent to the outside door that led into the restaurant. At some time between 6:56 p.m. and 7:00 p.m.[2], two individuals all dressed in black with masks came into the restaurant, armed with semi-automatics and fired sixteen shots, fifteen of which resulted in casings being left at the scene and one live round.

> [2] The Commonwealth was able to virtually pinpoint the time that the shooters entered the restaurant since Mr. Tommy's Restaurant had a Pennsylvania lottery machine. That lottery machine would freeze, thereby preventing the cashier from taking any more bets at 6:56 p.m. The woman who was operating the lottery machine was waiting for the lottery numbers to be drawn at 7:00 p.m. so she could write them down, and they had not been drawn when the two shooters entered the restaurant.

Although the people in the restaurant initially maintained that they did not see anything, ultimately a basic description of the two shooters evolved, that being two individuals all dressed in black, with masks, and one of the two was substantially taller than the other. Boyd indicated that the taller of the two was at least six foot three. From discussions with witnesses, it was clear that the intended victim of this

3

shooting was Mitchell. Mitchell was shot ten times, nine to his torso, which effectively knocked him out of his wheelchair and a tenth was placed in his head from point-blank range, when the shorter of the two shooters ran over to him and put the gun to his head and fired.  However, during the course of this execution, ███████████, who was getting a straw for her drink was shot three times. Her Mother, Terri Coles, was shot once in the shoulder and her father, Freeman, was shot three times. Terri Coles rushed over, picked up her daughter and ran to the kitchen for protection, imploring people to help her save her child. The two shooters then ran out of the building and through the parking lot. The police were called as were the paramedics and the paramedics arrived on the scene first. The paramedics removed ███████████ lifeless body from her mother and it was only at that time that Terri Coles realized that she had been shot.

███████████, her mother and Freeman were all taken to Presbyterian-University Hospital and while it was clear that ███████████ had suffered catastrophic and fatal injuries, the surgeons at Presbyterian-University Hospital attempted to save her life but to no avail. While Terri Coles was receiving treatment for her shoulder wound, surgeons in an adjacent area of the emergency room, were working on Freeman in an attempt to save his life. Despite being given more than thirty units of blood, Freeman died several hours after the shooting.

After the victims were removed from the restaurant, the police secured the scene and began to accumulate the evidence. At that scene fifteen shell casings were found in the restaurant, and one live forty-five caliber, which was found near the entrance to the restaurant. The police detained all of the individuals who were inside the restaurant and also those who were immediately outside and began to conduct initial interviews. The individuals who were initially interviewed by the police all denied that they had seen anything although the police were able to get a generic description of the two shooters. The description that they were able to put together was that one of the individuals was very tall and had bug eyes and the other was substantially shorter and was light-skinned. Both individuals were dressed in black and wore masks. In the days following the shooting, the police conducted follow-up interviews with all of the individuals who were at the restaurant. Shealey was re-interviewed and told the police that his original purpose of going to Mr. Tommy's was to try to sell Freeman some drugs. When Freeman did not want to discuss the purchase of drugs and after he had concluded his business with Washington, he got ready to leave the building when two shooters entered.

These individuals knocked him to the ground and while he was on the ground, he noticed that the taller of the two shooters was wearing black Nike sneakers that had a black swoosh emblem. He heard what he thought to be a misfire on the gun as though it had been jammed, in addition to hearing numerous other shots. He believed

that the two shooters were the individuals he saw standing in an area described as the cut adjacent to the parking lot shortly before going into the restaurant.

During that interview, he was able to identify the tall one as being Thompson. When the two shooters ran from the restaurant, he watched them leave and saw the shorter of the two turn and his mask came down and he realized that the shorter of the two individuals was Crisswalle. He knew Thompson since they had worked on repairing a car together.  He subsequently identified Thompson out of a photo array and identified him by his street name, "Munch". He did not, however, identify Crisswalle since he was fearful of reprisals if he would be the only individual that would identify these two as the shooters. Shealey was fearful for his safety and was put in the Witness Protection Program during the pendency of this case. When he learned that Crisswalle had been identified by someone else, he also identified Crisswalle as the smaller of the two individuals and identified him from a photo array.

Boyd's involvement in these homicides led to an investigation by his probation officer and he was ultimately violated for his possession of a cell phone and various curfew violations. In July of 2002, Boyd was brought to the homicide headquarters and was reinterviewed by the homicide detectives. Boyd told the homicide detectives that when he was in Mr. Tommy's Restaurant, that he had received a phone call about a possible drug deal and that he moved away from the table where Mitchell and Freeman were seated and moved to a booth that was near the entryway to the restaurant. He saw the two individuals come in and start shooting and he also saw the shorter of the two individuals run to Mitchell and then shoot him in the head at point-blank range. A forty-five caliber shell casing was found near Mitchell's head and a live forty-five caliber round was found near the doorway.

Boyd, who always carried a gun with him whenever he was selling drugs, ran out after the two shooters and watched them run through the parking lot. When he realized that he did not have a gun, he stopped his pursuit and headed back toward the restaurant. However, he saw both men running toward Frankstown Avenue toward a black, Chevrolet Impala, which he believed looked like Poundcake's car and then observed the shorter of the two stop, and heard him cursing and observed him jumping up and down and limping as he once again headed toward the car.

When the shorter of the two stopped, his mask came down and he recognized that individual as being Crisswalle. After the shooters had left, Boyd had a conversation with Duane Morris (hereinafter referred to as "Morris"), who had been smoking marijuana in the parking lot and Morris had told him that he had observed a car pull up and two individuals got out of the car and went into the restaurant. Morris also told him that the shorter of the two individuals was Crisswalle. Boyd also identified Crisswalle from a photo array. Based upon this information, the District

Attorney's Office wrote to the Parole Board requesting that Boyd be paroled early in light of his cooperation and help with this homicide investigation; however, that request was denied.

Morris was also interviewed by the police and he informed them that on January 25, 2000, that at approximately 6:30 p.m., he decided to smoke some marijuana and went to the dumpster area of the parking lot of Mr. Tommy's so he could do so unobserved. Morris indicated that earlier in the day that he had used one bag of heroin and he wanted to smoke the marijuana to continue his high. While smoking this marijuana, Morris observed Poundcake's car pull up to the parking lot and saw two individuals get out of the car, one of whom was much taller than the other. Both of these individuals were African-American and the taller of the two was darker skinned than the light-skinned, shorter individual. He watched both of them run into Mr. Tommy's Restaurant with semi-automatics in their right hands and, after hearing the shooting, saw them run out of the restaurant toward the black Chevrolet Impala which he believed to be Poundcake's car, and saw that the shorter individual was Crisswalle since his mask came down. He also saw Crisswalle limping as he ran to the car. Morris did not want to be involved in the ultimate investigation and left the parking lot and went across the street to Mason's Bar where he had a beer. While in the bar he observed Poundcake's car come to a stop in front of the bar and saw Crisswalle in the front passenger seat. In August of 2002, Morris was interviewed by homicide detectives and provided them with additional information and he identified Crisswalle from a photo array.

Officer Mike Reid of the Pittsburgh Police went to Presbyterian-University Hospital to interview Terri Coles who was being treated for the gunshot wound that she had received to her shoulder. Officer Reid purportedly received information from her that the two shooters were dark-skinned African Americans. The police did not conduct any in depth interview in light of her physical condition and the fact that she was in shock as a result of these shootings. At the time of trial Terri Coles denied that she ever told the police that the shooters were dark-skinned and, in fact, was adamant that one was medium-skinned and the other was light-skinned. She said that when she was interviewed she had realized that her eight year old daughter had died in her arms and she had just been informed that her husband, Freeman, had died.

After Shealey had identified Thompson as being the taller of the two shooters and that he was wearing black Nike sneakers with a black swoosh, the police obtained a search warrant for Thompson's residence which was located on Bennett Street, approximately one block from Mr. Tommy's Restaurant. The police recovered numerous items including a pair of black Nike sneakers with a black swoosh. They did not, however, recover any firearms. An arrest warrant was issued for Thompson and after his arrest and arraignment he was lodged in the Allegheny County Jail.

6

At the time of his arrest, Thompson was in possession of his cell phone and it was learned that the provider of his service was Cricket. The police obtained a search warrant for his phone records for the period of time from January 15, 2002 to January 31, 2002, the date of his arrest.  In reviewing Thompson's cell phone records, one phone number kept repeatedly appearing.  There seemed to be a pattern with respect to this phone number since that phone number was called every other day, and when it was called, there were repeated phone calls made to that number or from that number. The police subsequently determined that the  phone number belonged to Melissa Cox, (hereinafter referred to as "Cox"), and on March 11, 2002, Detectives Patrick Moffatt and Timothy Nutter visited Cox to determine what, if any, information she had about these homicides and her involvement with Thompson.

Initially, Cox did not want to talk to the police, however, she ultimately gave a taped statement. In that statement she indicated that she worked with mentally retarded adults and that she had met Thompson at a bus stop in Downtown Pittsburgh in late 2001. She realized that Thompson was mentally challenged which was borne out by the fact that he had an IQ of 72. She and Thompson became friends and she went to a number of parties with him. She and Thompson were scheduled to go out on the night of the shooting after she had finished work. At approximately 9:05 p.m. on January 25, 2002, Cox received a phone call from Thompson in which he said that he had killed some people in Homewood and he sounded scared. She was in shock and initially did not believe him. When the phone call ended, she called Zone 1 headquarters to ask, if in fact, these homicides had been committed and the police told her that they were too busy to talk to her but, in fact, three people had been killed. She attempted to call Thompson back but was only able to reach his voice mail.

Thompson's phone records also revealed that at 7:02 p.m. on the night of the shootings, that he called his sister, who lived in East Liberty. At the time of trial his sister testified that Thompson was in her basement playing video games with her sons when these shootings occurred. Thompson's sister's residence in East Liberty was approximately five miles from the shooting in Homewood. The cell tower that handled Thompson's call to his sister was closer to Homewood than it was to East Liberty.

Thompson was lodged in Pod 7D of the Allegheny County Jail on the night of his arrest. Also on that pod was Octavio Rodriquez, (hereinafter referred to as "Rodriquez"), who was Freeman's cousin. Earlier in the day of January 31, 2002, Rodriquez had received a phone call from his mother in which she told him that Freeman and ███████ had been murdered and that Thompson had been charged with their murders. Thompson was placed in the bubble on Pod 7D, which is a restricted protective area. When Rodriquez found out that Thompson was on his pod, he went to the bubble and asked him why he had murdered the little girl.

7

Thompson denied that he killed ██████████ and said that he shot one time and his gun jammed. Thompson also told Rodriquez that Mitchell owed Andre Marshall some money for drugs and that was the motivation for the shooting. Andre Marshall, however, was a state prisoner at the time of these shootings. Rodriquez called Homicide Detective Dennis Logan and gave him a statement as to the information that he had obtained from Thompson.

ECF No. 23-1 at 108 – 18.

## II.  PROCEDURAL HISTORY

### A.  State Court

The Pennsylvania Superior Court, in its Memorandum, dated May 31, 2017, recounted the

procedural history of the case in the state courts as follows:

On September 16, 2005, Appellant was convicted by a jury of three counts of criminal homicide, one count of aggravated assault, five counts of recklessly endangering another person, one count of possession of a firearm without a license, and one count of criminal conspiracy.  On December 12, 2005, Appellant received an aggregate sentence of life without the possibility of parole. Appellant's post-trial motion for a new trial was denied.

In February 2006, Appellant timely filed a notice of appeal and court-ordered 1925(b) statement. The trial court issued a responsive opinion in January 2010. This Court affirmed his judgment of sentence on February 22, 2012. *Commonwealth v. Thompson*, 46 A.3d 824 (Pa. Super. 2012) (unpublished memorandum). Appellant did not petition the Supreme Court for allowance of appeal.

In May 2013, Appellant pro se filed a PCRA petition seeking reinstatement of his right to file a petition for allowance of appeal to the Supreme Court nunc pro tunc.  New counsel was appointed.  In August 2013, appointed counsel filed a petition for leave to withdraw and *Turner/Finley* "no merit" letter.  In September 2013, the PCRA court issued Rule 907 notice of intent to dismiss Appellant's petition without a hearing and granted counsel permission to withdraw.  While his first petition was pending, Appellant pro se filed a petition for post-conviction DNA testing. In January 2014, Appellant's first petition was denied and dismissed as untimely by the PCRA court.

Appellant timely appealed.  In September 2015, this Court affirmed the denial of Appellant's PCRA petition, concluding that it was untimely and Appellant had failed to plead any exception to the time bar. *See Commonwealth v. Thompson*, 467

WDA 2014 (Pa. Super. 2015) (unpublished memorandum). This Court did not address Appellant's petition for DNA testing as "it appear[ed] that the petition [was] still pending in the court below" and that "the PCRA court [had] not disposed of [A]ppellant's post-conviction petition for DNA testing filed pursuant to 42 Pa.C.S. § 9543.1." *Id.* at *8.

In November 2015, the PCRA court issued Rule 907 notice of intent to dismiss Appellant's pro se petition for DNA testing. On May 24, 2016, this Court granted Appellant's application to compel the PCRA court to dismiss his petition and ordered the PCRA court to dispose of any pending PCRA's. **See** Superior Ct. Order, 46 WDM 2016 (Pa. Super. May 24, 2016). Before that order issued, however, the PCRA court entered an order dismissing Appellant's petition for DNA testing on May 16, 2016.

On June 28, 2016, Appellant *pro se* filed a notice of appeal. On August 3, 2015, Appellant timely filed a court-ordered 1925(b) statement. The PCRA court issued a responsive opinion.

ECF No. 23-3 at 161 – 63 (footnotes omitted).

The Superior Court affirmed the denial of the DNA testing. Petitioner apparently did attempt to file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court, but it was defective, and despite being given an opportunity to cure the defect, he did not and so the defective Petition was administratively closed. Com. v. Thompson, No. 53 WT 2017 (Pa.).[2]

## B. Federal Court

---

[2]  The docket with the designation "WT," apparently meaning "Western Temporary," is not accessible to the public like other dockets of the Pennsylvania state courts. However, the Court contacted the Prothonotary's Office of the Pennsylvania Supreme Court by phone and the use of the WT docket was explained by a staff member of that office. The Court discovered the existence of Petitioner's attempt to file a Petition for Allowance of Appeal from the docket sheet of the Pennsylvania Superior Court which listed the Supreme Court's WT docket number under the section of the Superior Court docket reserved for "Cross Court Actions." The Superior Court's docket for Com. v. Thompson, No. 935 WDA 2016 (Pa. Super.) is available at:

https://ujsportal.pacourts.us/DocketSheets/AppellateCourtReport.ashx?docketNumber=935+WDA+2016&dnh=9fyvCHFVZkzqGf1KquQGOg%3d%3d

(site last visited April 26, 2020).

The original habeas Petition was received by the Court on August 10, 2017, ECF No. 1, without an *in forma pauperis* ("IFP") motion for payment of the filing fee.  The filing fee was received five days later on August 15, 2017, and the Petition ("Original Petition") was formally docketed.  ECF No. 3. Respondents requested, and were granted an extension of time to file their Answer.  ECF Nos. 11 and 12.   Before Respondents filed their Answer, Petitioner filed a motion for leave to amend his Petition, ECF No. 13, which the Court granted. ECF No. 14.  Petitioner then filed an Amended Petition.  ECF No. 15.     However, the Amended Petition was deficient in that Petitioner had indicated that there was a document attached to the Amended Petition, which was in fact, not attached.  Accordingly, the Court issued a deficiency order requiring Petitioner to rectify the situation.  ECF No. 16.  Petitioner then filed another document entitled "Amended Habeas Corpus Petition."  ECF No. 17.  The Court ordered that the documents filed at  ECF No. 15 and ECF No. 17, were to be construed together and together were deemed to constitute Petitioner's Amended Petition.  ECF No. 18.

In the Amended Petition, Petitioner raised the following seven Grounds for Relief:

**GROUND ONE:**  14th Amendment, Due Process; Denial DNA testing.

ECF No. 15 at 5.

**GROUND TWO:**   Sixth Amendant [sic] of the United States Constitution 8th  & 14th.

Id. at 7.

**[GROUND THREE:]** Whether the PCRA court erred in denying Petitioner's DNA testing when the PCRA court determined that DNA testing would only prove who the tennis shoes [which were admitted into evidence at trial] belonged to[.]

ECF No. 17 at 2.[3]

> **[GROUND FOUR:]** Whether the PCRA court erred in denying the Petitioner's DNA testing when the PCRA court determined that because Petitioner admitted to killing [sic] the victims, DNA testing was not needed[.]

Id. at 3.

> **[GROUND FIVE:]**  The PCRA court erred in denying Petitioner's DNA testing where the Commonwealth, nor trial counsel did not request that the evidence of the sneakers presented at trial be tested for DNA finding, in that Petitioner denies having owned or worn those particular tennis shoes[.]

Id.

> **[GROUND SIX:]**  The PCRA Court erred in denying DNA testing where the PCRA Court over-looked a letter from the U.S. Department of Justice, dated 1/27/06, addressed to Mark Tranquilli, the assistant district attorney who tried Petitioner's case, in which said letter detailed vital information that should have been thoroughly investigated and admitted at trial as to the identity of a potential suspect in this case, and indeed exonerated Petition from this heinous crime[.]

Id. at 4.

> **[GROUND SEVEN:]**  The Superior Court erred as stated on page 8 of its NON PRECEDENT DECISION – see Superior Court I.O.P. 65-37, 2nd par: "Here, the PCRA court found DNA testing of the sneaker would only prove the identity of the individual who might[t] have worn them and not the identity of the perpetrator.

Id.

The Court ordered Respondents to file an Answer, addressing all the issues raised in the Amended Petition.  Id.  Respondents filed their Answer, ECF No. 23, and attached thereto as exhibits copies of much of the state court record.  ECF No. 23.   Respondents also caused the original state court record to be lodged with the Clerk's Office.    In the Answe, Petitioner asserted that the Amended  Petition  was  both  untimely  filed  and  meritless.    Petitioner  filed  a  "Rebuttal  to

---

[3] Grounds Three to Seven were raised in ECF No. 17.

Commonwealth's Answer to Petition for Writ of Habeas Corp[p]us" or traverse (the "Traverse"). ECF No. 25.

Shortly after filing the Traverse, Petitioner filed a document entitled "Motion for Relief Pursuant to Federal Rule of Civil Procedure 60(b)" (the "Rule 60(b) Motion"). ECF No. 26. On the same day he filed the Rule 60(b) Motion, Petitioner also filed "Petitioner's Memorandum Response in Support of Habeas Corpus Relief." ECF No. 27. In the Memorandum Response, Petitioner seemingly attempted to add yet more claims to the pending Amended Petition. See, e.g., id. at 32 ("In addition to all that Petition[er] has asserted thus far, it is important for the purposes of this application [sic], that Petitioner incorporate other issues [though vague and undeveloped herein] which were presented to the state court, particularly a motion to suppress Brian Shealey's indentification [sic] ….").   The Court ordered Respondents to file a Response to the Rule 60(b) Motion. ECF No. 28. After being granted an extension of time to do so, Respondents filed their Response to the Rule 60(b) Motion. ECF No. 31. Thereafter, the Court denied the Rule 60(b) motion, noting that "[b]ecause, as Respondents point out in their Response, no final judgment has yet been entered in this case, the Rule 60(b) Petition is premature. Accordingly, it is hereby ORDERED this 10th day of July 2018, that the Rule 60(b) Motion is denied without prejudice to refiling at an appropriate time. To the extent that the Rule 60(b) could be construed as anything other than a Rule 60(b) Motion, the Court will address such at the time it disposes of the pending Section 2254 habeas petition." ECF No. 32.

Petitioner filed a Motion for Status of the Case, ECF No. 33, which the Court granted in part and denied in part, granting it to the extent that the court indicated a decision  would be had in the

ordinary course but denying it to the extent the Motion for Status of the Case sought any other relief.
ECF No. 34.

All parties have consented to the plenary exercise of jurisdiction by the United States Magistrate Judge.  ECF Nos.  7 and 10.

## III.  APPLICABLE LEGAL PRINCIPLES

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, tit. I, § 101 (1996) (the "AEDPA") which amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254 was enacted on April 24, 1996.  Because the Amended Petition was filed after its effective date, the AEDPA is applicable to this case.  Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000).

## IV.  DISCUSSION

### A.  Petitioner Failed to Comply with the AEDPA Statute of Limitations.

The AEDPA requires that state prisoners file their federal habeas petition within one year after their conviction became final.  Specifically, the AEDPA provides that:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

In their Answer, Respondents pointed out that Petitioner's Original Petition was time-barred. We agree.

For present purposes, it appears that Petitioner's state convictions became final on March 23, 2012, thirty days (as required by state law to file the next step) after the Superior Court affirmed the judgment of sentence, where Petitioner did not file a timely Petition for Allowance of Appeal to the Pennsylvania Supreme Court. McConnell v. Thompson, Civ. A. No. 14–747, 2014 WL 4348173 (W.D. Pa. Sept. 2, 2014). See also Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); Kapral v. United States, 166 F.3d 565, 575 (3d Cir. 1999).

Petitioner is not deemed, pursuant to the prisoner mail box rule, to have filed the Original Petition with this Court until, at the earliest, July 31, 2017, i.e., the date on which he signed his Original Petition. ECF No. 3 at 18. Accordingly, 1,956 days passed between March 23, 2012 and July 31, 2017, or 1,591 days  (1956 – 365 days) beyond the one year statute of limitations.  Hence,

14

absent some reason to toll the statute of limitations or find another statutory starting point, the Original Petition is clearly untimely filed.

Of note, Petitioner did not file his first PCRA Petition in state court until May 13, 2013 more than one year after his conviction had become final.  The state courts held that the PCRA Petition was untimely filed.  Hence, the first PCRA Petition could not toll the federal AEDPA's statute of limitations because it was not a properly filed petition. Merritt v. Blaine, 326 F.3d 157, 159 (3d Cir. 2003) ("We hold that an untimely application for state post-conviction relief by a petitioner, who sought but was denied application of a statutory exception to the PCRA's time bar, is not 'properly filed' under 28 U.S.C. § 2244(d) (2).").  Petitioner also filed a second PCRA Petition, the DNA Petition but he did not file that Petition until November 9, 2015, which is also long after the one year AEDPA statute of limitations ran out as calculated from the date his conviction became final. Accordingly, the Original Petition violates the AEDPA statute of limitations and is time-barred.

Petitioner does not argue for another starting point for the AEDPA statute of limitations, but instead argues for equitable tolling.  ECF No. 25 at 1 - 2.  Petitioner asserts that he "has established two elements for Equitable Tolling." Id. at 2 (emphasis deleted).

### 1.  Equitable Tolling

The doctrine of equitable tolling applies to the AEDPA's statute of limitations. <u>Miller v. New Jersey State Dept. of Corrections</u>, 145 F.3d 616 (3d Cir.1998). The United States Court of Appeals for the Third Circuit described in <u>Miller</u> the limited nature of equitable tolling.

> [E]quitable tolling is proper only when the "principles of equity would make [the] rigid application [of a limitation period] unfair." *Shendock,* 893 F.2d at 1462. Generally, this will occur when the petitioner has "in some extraordinary way ... been prevented from asserting his or her rights." *Oshiver,* 38 F.3d 1380. The petitioner must show that he or she "exercised reasonable diligence in investigating and bringing [the] claims." *New Castle County,* 111 F.3d at 1126. Mere excusable neglect is not sufficient. *See Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *New Castle County,* 111 F.3d at 1126.

<u>Id.</u> at 618–19. Put succinctly, a habeas petitioner seeking to invoke the doctrine of equitable tolling must establish two requirements: 1) the existence of "extraordinary circumstances" which prevented him from filing in a timely manner and 2) that he acted with reasonable diligence. <u>Sandvik v. United States</u>, 177 F.3d 1269, 1271 (11th Cir. 1999) ("Equitable tolling is appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence."), *reh'g and suggestion for reh'g en banc denied,* 207 F.3d 666 (11th Cir. 2000). <u>See</u> <u>also</u> <u>Lacava v. Kyler</u>, 398 F.3d 271, 275–76 (3d Cir. 2005) ("Equitable tolling is appropriate ... such as when a state prisoner faces extraordinary circumstances that prevent him from filing a timely habeas petition ***and*** the prisoner has exercised reasonable diligence in attempting to investigate and bring his claims."). In order "[t]o establish the extraordinary circumstances necessary to equitably toll the AEDPA's statute of limitations, a habeas petitioner must prove that the cause of his delay was both beyond his control

16

and unavoidable even with diligence." <u>Simmons v. Yukins</u>, No. Civ. 01–CV–71287–DT, 2001 WL 739505, at *2 (E.D. Mich. May 9, 2001).

Because equitable tolling is a doctrine of equity, as its name implies, the equitable maxim of one who seeks equity must do equity, <u>Koster v. American Lumbermens Mut. Casualty Co.</u>, 330 U.S. 518, 522 (1947), likewise applies. In the present context, this principle of he who seeks equity must do equity requires that Petitioner not have delayed pursuit of his rights. This is so because "[e]quity is not intended for those who sleep on their rights." <u>Covey v. Arkansas River Co.</u>, 865 F.2d 660, 662 (5th Cir.1989).

Accordingly, in addition to proving the existence of extraordinary circumstances, and as a corollary of the principle that equity does not assist those who sleep on their rights, "the party seeking equitable tolling must have acted with reasonable diligence **throughout the period he seeks to toll.**" <u>Warren v. Garvin</u>, 219 F.3d 111, 113 (2d Cir. 2000) (emphasis added) (quoting <u>Smith v. McGinnis</u>, 208 F.3d 13, 17 (2d Cir. 2000)).

In the instant case, given that Petitioner filed his Petition 1,591 days after the one year statute of limitations period, in order to render his Petition timely, he would have to have the 1591 days equitably tolled in order to bring himself within the 365 days allotted by the AEDPA. <u>See</u> <u>Lacava v. Kyler</u>, 398 F.3d at 277.[4]

---

[4] The Court stated in <u>Lacava</u> that:

> It is a well-established principle that, in order for appellant to claim an entitlement to equitable tolling, he must show that he "exercised reasonable diligence in ... bringing [the] claims." *Miller,* 145 F.3d at 618–619 (*quoting New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1126 (3d Cir. 1997); *see also Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). **This obligation does not pertain solely to the filing of the federal habeas petition, rather it is an obligation that exists during the period appellant is**

Petitioner claims entitlement to equitable tolling based on alleged abandonment by his attorney after the Superior Court affirmed his conviction on direct appeal.  See, e.g., ECF No. 25 at 2; ECF No. 27 at 11.  Even if we assume that attorney abandonment constituted an "extraordinary circumstance," Petitioner would still have the burden to establish that the extraordinary circumstance actually prevented him from filing his habeas petition in a timely manner and that he acted with reasonable diligence.  Petitioner has failed to carry that burden.  Brown v. Shannon, 322 F.3d 768, 773 (3d Cir. 2003) (finding that the petitioner did not demonstrate a causal relationship between an extraordinary circumstance of the lateness of his filing if, acting with reasonable diligence, he could have filed on time notwithstanding the extraordinary circumstance).

As Respondents point out, Petitioner learned of the alleged abandonment by his attorney at the latest, as of November 9, 2012, as found by the Pennsylvania Superior Court.  ECF No. 23-3 at 93.  November 9, 2012, was more than four months before March 23, 2013, the date on which the time had run out for him to file his first PCRA petition.  Even after learning of the abandonment, Petitioner did not file a PCRA Petition until May 13, 2013, id., which was more than six months after November 9, 2012, when he first learned of his attorney abandonment.  Given this delay by Petitioner in failing to timely file a PCRA Petition, even after he had learned of his attorney's abandonment, he fails to show that he acted with reasonable diligence.

---

**exhausting state court remedies as well.** See, e.g., Jones v. Morton, 195 F.3d at 160 (equitable tolling is not warranted where appellant "made no showing that he 'exercised reasonable diligence' in satisfying the exhaustion requirement in order to present his claims in a timely federal habeas petition").

Lacava v. Kyler, 398 F.3d at 277 (emphasis added).

Furthermore, even after the Superior Court denied his DNA PCRA petition on May 31, 2017, Petitioner waited an additional two months until he signed the Original Petition on July 31, 2017. ECF No. 1 at 18.  Not only does Petitioner again fail to show that he acted with reasonable diligence, but he fails to show that there was any circumstance that prevented him from filing earlier.  Cristin v. Wolfe, 168 F. App'x 508, 512 (3d Cir. 2006) (noting that an inmate's awareness of her "attorney's failure to petition ... for an allowance of appeal at least three months before the end of AEDPA's one-year period of limitations" followed by late filing of a pro se petition was not an exercise of "reasonable diligence" and not entitled to equitable tolling).

In "Petitioner's Rebuttal to the Commonwealth's Answer," in the context of Petitioner's claim of abandonment, he makes a passing, one-time, reference that his former appellate counsel knew "that his client suffers from a (learning disability)…" ECF No. 25 at 2.  Petitioner makes no other reference to or explanation of any disability. Petitioner fails to explain why, even with this unspecified disability, he was able to file his Original Petition when he did.   Obviously, the condition did not "prevent" Petitioner from filing the Original Petition.  Petitioner offers no explanation of why, even with this unspecified condition, he was able to file when he did and not file any earlier.  Hence, Petitioner fails to show that the reference learning disability constituted an extraordinary circumstance that prevented him from filing.  Taylor v. Johnson, 12-1010-GMS, 2015 WL 5074338, at *4 (D. Del. Aug. 26, 2015) ("First, the courts that have considered whether a petitioner's dyslexia constitutes an extraordinary circumstance have uniformly held that a prisoner's dyslexia or a learning disability, standing alone, does not justify equitable tolling AEDPA's limitations period. See Carvell v. Reilly, 2015 WL 631995, at *3 (D.N.H. Feb. 13, 2015)(collecting cases); Snyder v. Secretary, DOC, 2015 WL 439306, at *11

19

('being dyslexic does not constitute an impairment sufficient to render a petitioner incapable of making a timely application.') The court finds the reasoning in these decisions persuasive.").

Furthermore, Petitioner also fails to show that he exercised the reasonable diligence necessary to show entitlement to equitable tolling.  Accordingly, Petitioner has failed to carry his burden to show entitlement to equitable tolling, having failed to establish either extraordinary circumstances that prevented him from filing or that he acted with reasonable diligence throughout the time he seeks to have equitably tolled.

## 2.  Actual Innocence

Petitioner also invokes "actual innocence" or a "miscarriage of justice" several times throughout his filings in this Court. ECF No. 25 at 5; ECF No. 26 at 2.  Most of Petitioner's claims of actual innocence rely upon alleged individuals who claimed responsibility for the shooting.  ECF No. 26 at 2 (claim that a Rasheed Baskins admitted to Theodore Owens that Baskins was the shooter).

As to Petitioner's claim of "actual innocence," contained in the Rule 60(b) Motion, such a claim is not cognizable in federal Section 2254 habeas proceedings to the extent that Petitioner is raising a free-standing claim of actual innocence.  Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004) ("It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'") (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993)); Harper v. Wingard, CV 17-929, 2020 WL 1532288, at *12 (W.D. Pa. Mar. 31, 2020).

To the extent that Petitioner is attempting to make a gateway claim actual innocence in an attempt to overcome a procedural default or a time bar, we find that Petitioner fails to meet the very

difficult-to-meet test of actual innocence under Schlup v. Delo, 513 U.S. 298, 115 (1995) in light of the overwhelming evidence of his guilt. McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) (using Schlup standard of actual innocence for gate-way claim of actual innocence to overcome AEDPA's time bar).

Petitioner's pointing to another individual who claimed responsibility for the shooting at most might raise a reasonable doubt about Petitioner's guilt or innocence but this is insufficient under the controlling Schlup standard.   Under Schlup, "[t]he meaning of actual innocence as formulated by *Sawyer*, and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."   Schlup v. Delo, 513 U.S. at 329.   In light of Petitioner's confessions to two individuals which included his description of events to an inmate at the jail, that only the shooters or someone present at the shooting would have known, i.e., that one of the guns (he claims his) jammed after firing only one round, and Shealey's identification of him as one of the shooters,  Petitioner fails to show that no reasonable juror would have convicted him even in light of the evidence of someone else claiming to be one of the shooters and/or claiming that Petitioner was not one of the shooters. See, e.g., ECF No. 23-1 at 184 – 185 (trial court opinion summarizing evidence of Petitioner's guilt).

Accordingly, Petitioner has failed to show either "actual innocence" or entitlement to equitable tolling.  His failures to do so clearly render his Original Petition untimely under the AEDPA, and as such, this case must be dismissed for violating the AEDPA statute of limitations.

### 3.   The Rule 60(b) Motion and Memorandum Response

As noted previously, Petitioner filed a Rule 60(b) Motion, which this Court denied. However, in the order denying the Rule 60(b) Motion, the Court noted that "To the extent that the Rule 60(b) could be construed as anything other than a Rule 60(b) Motion, the Court will address such at the time it disposes of the pending Section 2254 habeas petition." ECF No. 32.

In the Rule 60(b) Motion, Petitioner raised five claims for which he sought habeas relief: "[1.] ['a']ctual ['i']nnocence, [2.] ['p']rosecutorial ['m']isconduct, [3.]['n']ewly ['d']iscovered['e']vidence, [4.] ['t']rial ['c']ourt ['e']rror and [5.]['i']neffective ['a']ssistance of ['c']ounsel. ECF No. 26. Given Petitioner's pro se status, we liberally construe Petitioner's Rule 60(b) Motion as an attempt to further amend the Amended Petition to add the five claims raised therein.

In addition, as noted above, in "Petitioner's Memorandum Response in Support of Habeas Corpus Relief," ECF No. 27, Petitioner seemingly attempted to raise yet more issues: (1) "Ineffective Assistance of Counsel," for withdrawing the notice of alibi defense, for not assuring that the jury received the requested notes of testimony of Petitioner's witnesses, and for failing to file the Petition for Allowance of Appeal, id. at 12 -26; (2) "Double Jeopardy Violation," id. at 26 – 28; (3) Prosecutorial Misconduct/Brady Violation, id. at 28 – 32; and (4) "Other Grounds," id. at 32 – 33.

Treating the Rule 60(b) Motion and the Memorandum Response as motions for leave to further amend the Amended Petition, the Court will deny the Motions because, if the Original Petition was time barred, so are all of the sought after amendments.

### B.  Ground One and Grounds Three Through Seven Do Not Merit Relief.

In the exercise of complete review of the Amended Petition, even if the it is assumed that the Amended Petition is not time barred, the Grounds for Relief raised in the Amended Petition are meritless.

In Ground One of the Amended Petition, Petitioner states somewhat cryptically "14th Amendment, Due Process; Denial DNA testing." ECF No. 15 at 5. In the section of the pre-printed Petition where it asks Petitioner to state the underlying facts of Ground One, Petitioner wrote: "See Attached Amended Petition." Id. We understand Petitioner's reference to the "Attached Amended Petition" to be a reference to ECF No. 17. Hence, we understand Petitioner to be raising in Ground One complaints about the second PCRA Petition that he filed in state court seeking DNA testing, which is what he raised in ECF No. 17, and that all of the claims raised in Ground One and Grounds Three through Seven concern alleged violations of his federal rights during the second PCRA Proceedings involving his request for DNA testing.

Respondents likewise understand that Ground One and Grounds Three through Seven all attack the state courts' actions in the second PCRA proceedings seeking DNA testing. Respondents in their Answer noted that "Petitioner's first habeas claim is a multi-faceted claim wherein he asserts that the state court erred in denying his motion for DNA testing on a pair of tennis shoes. (See CM/ECF Docket Entry 15, p. 5, 7; Docket Entry No. 17, p. 2-4)." ECF No. 23 at 40.

The critical deficiency with Petitioner's claims in Ground One and Grounds Three through Seven is that claims concerning errors in the course of even regular PCRA proceedings, yet alone DNA PCRA proceedings, are not cognizable in federal habeas proceedings.

Indeed, no matter what deficiencies may have occurred during Petitioner's PCRA

proceedings, as we have previously explained, such errors during the course of the PCRA proceedings simply cannot provide a basis for federal habeas corpus relief. This Court has held that:

> In Ground Two, Petitioner complains about errors in the PCRA proceedings. However, the clear rule of law in the Third Circuit is that errors during the course of the PCRA proceedings do not provide a basis for relief in federal habeas proceedings. Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("The federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation.... Federal habeas power is 'limited ... to a determination of whether there has been an improper detention by virtue of the state court judgment.' "); Lambert v. Blackwell, 387 F.3d 210, 247 (3d Cir. 2004) ("alleged errors in collateral proceedings ... are not a proper basis for habeas relief from the original conviction."). Accordingly, Ground Two simply does not afford a basis for the granting of a writ of habeas corpus.

Ainsworth v. Atty. Gen. of Pennsylvania, CV 16-1354, 2018 WL 2729266, at *6 (W.D. Pa. May 18, 2018), report and recommendation adopted, CV 16-1354, 2018 WL 2725437 (W.D. Pa. June 6, 2018). In Ainsworth, we were addressing errors in the course of regular PCRA proceedings seeking to immediately undo the sentence and/or conviction, whereas in contrast Petitioner herein is seeking to attack special PCRA proceedings that seek only to have the state conduct DNA testing as a possible pre-cursor to filing a traditional PCRA seeking to attack the conviction and/or sentence. If errors in the PCRA proceedings which could lead to acquittal in state court are not cognizable in federal habeas proceedings, then surely errors in the course of the special PCRA proceedings, seeking solely DNA testing, cannot be cognizable. Accordingly, Ground One and Grounds Three through Seven fail to afford Petitioner a ground for any federal habeas relief.

### C.  Ground Two Fails to Merit Relief.

24

In Ground Two, Petitioner complains about the fact that his direct appeal counsel allegedly abandoned him.  He complains that after the Superior Court issued its decision and affirmed the judgment of sentence in the direct appeal, his attorney abandoned him, notwithstanding that the attorney sent Petitioner a letter indicating that he would file a petition for re-argument with the Superior Court and thereafter file a Petition for Allowance of Appeal.  Petitioner complains that his attorney never filed such a petition for re-argument or a Petition for Allowance of Appeal to the Pennsylvania Supreme Court.    Given Petitioner's invocation of the Sixth Amendment, we understand that Petitioner is making a claim of ineffective assistance against his direct appeal counsel.   See, e.g., ECF No. 3 at 9 ("The fact that the Superior Court recognized counselor's ineffectiveness as stated on page 7, (Counsel's failure to file a timely petition for allowance of appeal could be considered a newly-discovered fact ….To continue, on the same page the Superior Court states: (counsel's failure to perfect appellant's appeal [i.e., to file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court] constituted abandonment by counsel and could serve as a newly discovered fact….").

Petitioner claims ineffective assistance of his direct appeal counsel for not filing a petition for re-argument in the Superior Court after the Superior Court rendered its decision and for failing to file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court.  Although not raised by Respondents in the Answer, we have an independent obligation to apply the correct law.[5]  The

---

[5]  U.S. v. Alvarez, 646 F. App'x 619, 620 (10th Cir. 2016) ("Contrary to Mr. Alvarez's argument, a party's failure to raise all defenses does not preclude the district court from applying the correct law and properly disposing of a claim. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ('When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'). Mr. Alvarez

correct law is that Petitioner had no federal constitutional right to counsel after the Superior Court rendered its decision and thus, cannot establish a federal claim of denial of a non-existent federal right to counsel.

As well-explained by a fellow member of this Court:

> As to whether it was ineffective for Attorney Garvin not to file an [sic] PAA from the Superior Court's adverse suppression decision, this issue was raised in the PCRA proceedings. …. More importantly perhaps, even if we assume that Attorney Garvin was ineffective in not filing a PAA, which is a discretionary petition for review, ineffectiveness at that stage of the proceedings is not a ground for granting federal habeas relief because at that stage of the proceedings Petitioner had no federal constitutional right to counsel. *Wainwright v. Torna,* 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982); *Ross v. Moffitt,* 417 U.S. 600, 610, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974).

> A claim of ineffectiveness of counsel is cognizable in federal habeas proceedings only if there is a federal right to counsel at the stage when counsel is alleged to have been ineffective. *See Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted). Here, at the point where Attorney Garvin is alleged to have been ineffective, i.e., after the Superior Court rendered its decision in the suppression appeal, which is during the stage of the discretionary appeal to the Pennsylvania Supreme Court, Petitioner did not have a federal right to counsel. *Wainwright v. Torna,* 455 U.S. at 587-88 ("Since respondent had no constitutional right to counsel [in order to file a request for discretionary appeal], he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely."); *Ross v. Moffitt,* 417 U.S. at 610 (there is no federal constitutional right to counsel to file a discretionary appeal petition). Hence, this ineffectiveness claim does not merit the grant of federal habeas relief.

---

contends that 'the District Court was only authorized to answer to the [jurisdictional] defense presented by the Government.' Aplt. Br. at 3. This is incorrect. The district court has an obligation to apply the correct law"); Alston v. D.C., 561 F. Supp. 2d 29, 37 (D.D.C. 2008) ("the court nevertheless analyzes this claim under the appropriate law, *Smith v. Mallick,* 514 F.3d 48, 51 (D.C. Cir. 2008) (holding that courts have an independent obligation to apply the correct law regardless of the parties' arguments)").

<u>Moorefield v. Grace</u>, CIV.A. 06-541, 2007 WL 1175847, at *6 (W.D. Pa. Feb. 26, 2007), <u>report and recommendation adopted,</u> CIVA 06-541, 2007 WL 927965 (W.D. Pa. Mar. 26, 2007), <u>judgment vacated on reconsideration on other grounds,</u> CIV.A.06 541, 2007 WL 1068469 (W.D. Pa. Apr. 5, 2007), and <u>report and recommendation adopted,</u> CIV.A.06 541, 2007 WL 1068469 (W.D. Pa. Apr. 5, 2007).

While it is true that Petitioner possessed a Fourteenth Amendment right to effective assistance of counsel in effectuating a direct appeal and in filing a brief, <u>Evitts v. Lucey</u>, 469 U.S. 387, 388–89 (1985), that federal right to effective assistance of counsel terminated upon the Superior Court rendering its decision.  Therefore, that Petitioner's counsel did not file a petition for rehearing en banc cannot constitute ineffective assistance of counsel under the United States Constitution because Petitioner possessed no such right to counsel at that point in the proceedings.

The United States  Court of Appeals for the Third Circuit in <u>Jackson v. Johnson</u>, 217 F.3d 360, 364–65 (5th Cir. 2000) held as follows:

> Jackson asks us to hold that he received ineffective assistance of counsel on direct appeal because his attorney failed (1) to file a motion for rehearing or, alternately, (2) to inform Jackson of his right to file such motion *pro se.* Jackson cannot have received constitutionally deficient counsel on his motion for rehearing, however, if he had no constitutional right to counsel for purposes of filing a rehearing motion. "A criminal defendant does not have a constitutional right to counsel to pursue discretionary state appeals."[22] When a state grants a criminal defendant an appeal of right, the Constitution requires only that the defendant's claims be "once ... presented by a lawyer and passed upon by an appellate court."[23] Not only does a motion for rehearing come after the appellate court has passed on the claims; there can be no question that the granting of a motion for rehearing lies entirely within the discretion of a court of appeals. Rehearing at that point is by no means an appeal of right.
>
> We conclude that a criminal defendant has no constitutional right to counsel on matters related to filing a motion for rehearing following the disposition of his

case on direct appeal. We therefore affirm the district court's denial of Jackson's application for a writ of habeas corpus.

(footnote omitted). Accord Simon v. Govt. of Virgin Islands, DC CIV APP 2003/024, 2018 WL 2994374, at *9 (D.V.I. June 13, 2018) ("The Court notes, however, that even if Simon had raised this ground for ineffective assistance of counsel, it would meet with the same fate because counsel's constitutional obligations to a client end with the filing of the opinion in the first appeal as of right and therefore consultation regarding a next level appeal is not required by the Constitution."), *aff'd sub nom.*, Simon v. Govt. of the Virgin Islands, 929 F.3d 118 (3d Cir. 2019). See also Woods v. Holman, 18-14690-P, 2019 WL 5866719, at *4 (11th Cir. Feb. 22, 2019) ("Because both forms of review that Threatt failed to seek—rehearing in the Alabama Court of Criminal Appeals and certiorari review in the Alabama Supreme Court—are unquestionably discretionary, reasonable jurists could not disagree over whether Woods had a right to counsel for the purpose of seeking those forms of review. And because Woods 'had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel' by Threatt's 'failure to file the application' for either form of review.").

Accordingly, Petitioner cannot establish a federal claim of the denial of effective assistance of counsel and this is so even if Petitioner had some state law right to effective assistance of counsel at the stage of petitioning the Superior Court for rehearing or for filing a Petition for Allowance of Appeal. Dorsey v. Wilson, CIV.A. 07-509, 2008 WL 2952892, at *2 (W.D. Pa. July 30, 2008) ("Petitioner next objects to the Report's disposition of Claim # 11, wherein the Report found that any claim of appellate counsel's ineffectiveness for failing to raise a claim in the Petition for Allowance of Appeal ('PAA') to the Pennsylvania Supreme Court failed to state a claim for

habeas relief as there is no federal right to counsel and where there is no federal right, there can be no basis upon which to grant habeas relief.  That he may have a state right law to counsel, whether arising from the State Constitution or State rules of criminal procedure, is of no consequence because in order to be granted federal habeas relief, Petitioner must show a denial of a federal constitutional or statutory right. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wells v. Petsock,* 941 F.2d 253 (3d Cir. 1991).").   As such, Ground Two does not afford Petitioner federal habeas relief.

## V.  CERTIFICATE OF APPEALABILITY

A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2).  The Court concludes that jurists of reason would not find it debatable whether the Petitioner made a substantial showing of the denial of a constitutional right.  Accordingly, a certificate of appealability will be denied.

## VI.  CONCLUSION

For the reasons set forth herein, the Amended Petition will be denied and a certificate of appealability will be denied and the following order is entered:

29

## **<u>ORDER</u>**

**AND NOW,** this 27th day of April 2020, it is hereby **ORDERED** that for the reasons set forth herein, the Amended Petition is **DENIED**.  Because we conclude that jurists of reason would not find the foregoing debatable, a certificate of appealability is likewise **DENIED**.


BY THE COURT,

***<u>Maureen P. Kelly</u>***
MAUREEN P. KELLY
UNITED STATE MAGISTRATE JUDGE


cc:     All counsel of record via CM-ECF


WILLIAM G. THOMPSON
GM9858
1 Kelley Dr.
Coal Township, PA 17866